CLYDE K. and Sheila K., individually
and as guardians for Ryan K., a
minor, Plaintiffs–Appellants,

v.

PUYALLUP SCHOOL DISTRICT,
NO. 3, Defendant–Appellee.

CLYDE K.; Sheila K., Plaintiffs–
Appellants,

v.

PUYALLUP SCHOOL, Defendant–
Appellee.

Nos. 93–35572, 93–35954.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 3, 1994.

Decided Sept. 13, 1994.

Charles D. Williams, Silverdale, WA, Neil R. Martinson Federal Way, WA, for plaintiffs-appellants.

Joni R. Kerr, Vandenberg & Johnson, Tacoma, WA, for defendant-appellee.

Before: WRIGHT, KOZINSKI and FERNANDEZ, Circuit Judges.

KOZINSKI, Circuit Judge.

Under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., parents and school officials must try to reach agreement on the appropriate educational program for a disabled student. We consider what happens when they fail.

## I

Ryan K. is a fifteen-year-old student with Tourette's Syndrome and Attention Deficit Hyperactivity Disorder (ADHD). Prior to the events giving rise to this litigation, Ryan received special education services while enrolled in mainstream schools in the Puyallup School District. Between mid-January and mid-March 1992, Ryan's behavioral problems at Ballou Junior High School escalated dramatically. He frequently disrupted class by taunting other students with name-calling and profanity, insulting teachers with vulgar comments, directing sexually-explicit remarks at female students, refusing to follow directions, and kicking and hitting classroom furniture. In addition, Ryan was involved in several violent confrontations. On January 27, he received a one-day suspension for punching another student in the face. On February 10, he received a second suspension for pushing another student's head into a door. Finally, on March 12, Ryan was removed from school pursuant to an emergency expulsion order after he assaulted a school staff member.[1]

Ryan's parents, Clyde and Sheila K., agreed with school officials that it was no longer safe for Ryan to remain at Ballou. Ryan's teachers and school administrators met shortly after his expulsion to discuss available alternatives. They suggested placing Ryan temporarily in an off-campus, self-contained program called Students Temporarily Away from Regular School (STARS), where Ryan would be in a more structured environment and receive more individualized attention. On March 17, 1992, the school notified Ryan's parents of its recommenda-

tion that Ryan be placed in STARS on an interim basis until he could be safely reintegrated into regular school programs.

Though Ryan's parents initially agreed with the school's proposed change of placement, they subsequently had second thoughts. On March 27, 1992, they requested a due process hearing under Wash.Admin.Code § 392–171–531; on April 6, they formally rejected placement at STARS until a new Individualized Education Program (IEP) had been drafted. After efforts to draft a new IEP broke down, Ryan's parents insisted that he return to Ballou for the remainder of the school year. Over the summer, a ten-day due process hearing was held pursuant to 20 U.S.C. § 1415(b)(2). The administrative law judge issued her ruling on September 14, 1992, concluding that the school fully complied with the IDEA. The parents appealed to the district court, which, after hearing additional testimony and reviewing the record of the administrative proceedings, affirmed the ALJ's decision in all material respects on March 23, 1993.[2]

## II

■ As a preliminary matter, the parties disagree over who should have borne the burden of proof in the district court. The school clearly had the burden of proving at the administrative hearing that it complied with the IDEA. Ryan's parents contend the burden of proof remained on the school in the district court as well, even though they were the ones appealing the administrative ruling. Generally, the party challenging an agency's decision bears the burden of proof. Whether the IDEA calls for an exception to this general principle has yet to be decided in this circuit.

The parents rely on *Oberti v. Board of Educ.*, 995 F.2d 1204 (3d Cir.1993), which held that the burden of proof remains on the school even if the school prevails at the administrative hearing. The court in *Oberti* stated that placing the burden of proof on

---

1. Though the school contended below that Ryan's disruptive behavior wasn't related to his disability, Ryan's doctors disagreed. The district court found that Ryan's behavioral problems did stem from Tourette's Syndrome and ADHD. That finding is not clearly erroneous and, indeed, the school district doesn't challenge it.

2. Judge Bryan was already familiar with both the IDEA and Puyallup's programs. *See Parents of Student W v. Puyallup Sch. Dist., No. 3,* 31 F.3d 1489 (9th Cir.1994) (affirming summary judgment for school district on validity of ten-day suspension guidelines).

the school is essential to ensure that parents' rights under the IDEA aren't undermined. *Id.* at 1219. We note, however, that merely because a statute confers substantive rights on a favored group does not mean the group is also entitled to receive every procedural advantage. Absent clear statutory language to the contrary, procedural questions are resolved by neutral principles that are independent of any particular statute's substantive policy objectives. Allocation of the burden of proof has long been governed by the rule that the party bringing the lawsuit must persuade the court to grant the requested relief. Because we find nothing in the IDEA suggesting that a contrary standard should apply here, we join the substantial majority of the circuits that have addressed this issue by placing the burden of proof on the party challenging the administrative ruling. *See Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 991 (1st Cir.1990); *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C.Cir.1988); *Spielberg v. Henrico County Pub. Sch.*, 853 F.2d 256, 258 n. 2 (4th Cir.1988).

### III

Ryan's parents allege various procedural violations of the IDEA. We address each of these in turn.

■ **A.** On March 11, 1992, after Ryan had been suspended twice for assaulting other students, the school hired an aide to observe Ryan's behavior over a three-day period. The aide was hired at the urging of Ryan's doctors, who suggested that a firsthand report on his behavioral problems would be helpful in evaluating appropriate responses. Ryan's parents claim the school violated 34 C.F.R. § 300.504(a) because it failed to give them written notice before hiring the aide.

The parents contend that hiring the aide constituted a change of Ryan's educational program, thus ·triggering the prior notice requirement of section 300.504(a). We agree with the district court that hiring the aide did not change Ryan's educational program. The aide merely observed Ryan's behavior; he didn't provide educational services or any other type of assistance. As a result, prior written notice was not required. *See Doe v. Maher*, 793 F.2d 1470, 1487 (9th Cir.1986), *aff'd sub nom. Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

■ **B.** In the wake of Ryan's emergency expulsion on March 12, school officials met to consider their options.[3] Ryan's multidisciplinary team concluded that his increasingly aggressive behavior posed a clear danger to others at the school and was significantly disrupting the educational process for other students. The team reviewed Ryan's current IEP—which had taken effect in October 1991 and remained valid through the end of the school year—and concluded that its objectives could be met satisfactorily at STARS. On March 17, the school sent Ryan's parents a Notice of Proposed Placement Change, suggesting that Ryan attend STARS on a temporary basis while the parents and school officials developed a plan to reintegrate him into a mainstream setting. Ryan's parents allege that the school violated IDEA procedural requirements by failing to draft a new IEP before attempting to move Ryan to STARS.

■ We reject this contention. The district court found that Ryan's parents initially agreed with the school's recommended placement, including the determination that Ryan's current IEP could be implemented at STARS. Though Ryan's parents vigorously contend they never consented to this change of placement, we cannot conclude, after reviewing the record, that the district court's contrary finding is clearly erroneous. Since the primary goals and objectives of Ryan's current IEP could be achieved in the proposed placement, the school was not obligated to draft a new IEP prior to making its recommendation. *See Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1042 (5th Cir. 1989).[4]

---

3. Schools can temporarily remove a disabled student from a mainstream placement only if the child poses an immediate threat to the safety of himself or others. Absent a court order or parental consent, the student can't be suspended for more than ten school days if his misconduct stems from a protected disability. *See Honig*, 484 U.S. at 325, 108 S.Ct. at 605.

4. Ryan's parents also allege a violation of 34 C.F.R. § 300.534(b), claiming the school should have reassessed Ryan's special education needs before recommending a change of placement.

**■ C.** After preparations had been made for Ryan's arrival at STARS, Ryan's parents informed the school they wouldn't let him attend until a new IEP was drafted. Though school officials continued to believe Ryan's current IEP could be implemented satisfactorily at STARS, they agreed to work with the parents in drafting a new one. Ryan's parents contend the school violated the IDEA when it failed to bring teachers from Ballou to the IEP meetings.

The record reveals that the school complied with its obligations under the IDEA. Under 34 C.F.R. § 300.344(a)(2), Ryan's teacher had to attend the meetings. The school saw to this by having a teacher and a behavioral specialist from STARS attend the IEP meeting on May 1. Ryan's parents claim this didn't suffice because Ryan's teachers were those from Ballou, not those from STARS. By May 1, however, Ryan hadn't attended Ballou for 45 days; in accordance with the earlier agreement reached between the school and Ryan's parents, he had been removed from Ballou and enrolled in the STARS program. Thus, as the district court found, the school complied with section 300.344 by having teachers from STARS attend the IEP meeting. *See* 34 C.F.R. § 300.344, note 1(b) (noting that teacher required to be present at meeting can be either teacher from student's current placement, or teacher from student's future placement).[5]

**IV**

We turn next to the alleged substantive violations of the IDEA.

**■ A.** Ryan's parents claim the district court erred when it held that STARS was the "stay-put" placement under 20 U.S.C. § 1415(e)(3), which provides that during the pendency of any proceedings under the IDEA, "the child shall remain in the then current educational placement." As noted above, when Ryan's parents requested a due process hearing on March 27, 1992, Ryan's current educational placement was STARS; with the parents' consent, the school had already removed him from Ballou. That Ryan's parents later withdrew their consent on April 6 and pursued administrative remedies doesn't change this reality. We agree with the district court that STARS was the stay-put placement under section 1415(e)(3).

**B.** Ryan's parents also contend the district court erred in concluding that STARS was the least restrictive environment in which Ryan could be educated satisfactorily. *See* 20 U.S.C. § 1412(5)(B). They claim Ryan can be educated in a mainstream set-

---

Because they failed to raise the issue at either the administrative hearing or in the district court, we decline to consider it here.

**5.** Though Ryan's parents were frustrated by the absence of Ballou teachers at the May 1 meeting, this did not justify the singularly counterproductive stance taken by their attorney, Neil Martinson. Instead of at least initiating discussions with the school, he abruptly ended the meeting, declaring that further negotiations would be pointless. He then announced that Ryan would be returning to Ballou on the next school day, May 4. When school officials pleaded with the parents to stay and help prepare for Ryan's return to Ballou, Martinson insisted they leave the meeting with him at once.

Judge Bryan, who remained composed and patient throughout the proceedings in the district court, cogently asked, "[w]hat happened there? All we know is that [Ryan's parents] did not participate very actively. Their participation was through Mr. Martinson. Mr. Martinson's approach was rigid, it was one way only, 'my way or the highway,' so to speak. It was not realistic."

If Martinson was concerned that the parents might be waiving their statutory rights by staying, he surely knew how to make a record indicating that the parents were staying under protest. But it is difficult to imagine what interests of Ryan's were served by thrusting him back into a school environment where he was having significant difficulty and then refusing even to discuss how these problems might be ameliorated. Such hard-ball tactics are seldom productive even in ordinary civil litigation, and are particularly ill-advised in this context. Working out an acceptable educational program must, in the end, be a cooperative effort between parents and school officials; the litigation process is simply too slow and too costly to deal adequately with the rapidly changing needs of children. *See, e.g.,* nn. 6 & 10 *infra.* In addition, litigation tends to poison relationships, destroying channels for constructive dialogue that may have existed before the litigation began. This is particularly harmful here, since parents and school officials must—despite any bad feelings that develop between them—continue to work closely with one another. As this case demonstrates, when combat lines are firmly drawn, the child's interests often are damaged in the ensuing struggle.

ting if the school provides a personal classroom aide to assist him.

■■■ We've recently adopted a four-part test to determine whether a disabled student's placement represents the least restrictive environment. *See Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398 (9th Cir.1994). In applying this test, we consider: (1) the academic benefits of placement in a mainstream setting, with any supplementary aides and services that might be appropriate; (2) the non-academic benefits of mainstream placement, such as language and behavior models provided by non-disabled students; (3) the negative effects the student's presence may have on the teacher and other students; and (4) the cost of educating the student in a mainstream environment. *Id.* at 1401, 1404. We review for clear error the district court's factual findings as to each of these elements; we review de novo its conclusion as to the appropriateness of a student's educational placement under the IDEA. *Id.* at 1402.

■■■ Applying these elements to the case before us, we conclude that STARS was the least restrictive environment.[6] First, it is undisputed that by March 1992, Ryan no longer received any academic benefit from his mainstream placement at Ballou. Ryan's disruptive classroom behavior largely prevented him from learning; indeed, test results indicate that his level of academic achievement actually declined during the 1991–92 school year. Nor is it likely—given the severity of Ryan's behavioral problems—that a personal aide would have made a meaningful difference.[7] Second, Ryan derived at best only minimal non-academic benefits from his placement at Ballou. No evi-

dence in the record suggests that Ryan modelled his behavior on that of his non-disabled peers. Moreover, Ryan's doctors found that he was socially isolated at Ballou, had few friends, and suffered a great deal of stress from the teasing he was subjected to by other students.

With respect to the third element, the record indicates that Ryan's presence in classes at Ballou had an overwhelmingly negative effect on teachers and other students. By March 1992, Ryan's behavior had become dangerously aggressive: He violently attacked two students before being expelled for assaulting a school staff member. These are not incidents school officials can dismiss lightly; they have a special obligation to ensure that students entrusted to their care are kept out of harm's way. In addition to posing a danger to others at Ballou, Ryan's behavioral problems regularly disrupted class. The record discloses that he frequently taunted other students with name-calling and profanity, and that on several occasions he made vulgar and insulting comments to teachers.

Ryan also directed sexually-explicit remarks at female students, another legitimate cause for concern among school officials. Given the extremely harmful effects sexual harassment can have on young female students, public officials have an especially compelling duty not to tolerate it in the classrooms and hallways of our schools. *See* Monica L. Sherer, Comment, *No Longer Just Child's Play: School Liability Under Title IX for Peer Sexual Harassment*, 141 U.Pa. L.Rev. 2119, 2133–35 (1993) (noting that targets of peer sexual harassment often experi-

---

**6.** We note the limited scope of our decision: STARS was intended to be a temporary placement; the parties agreed Ryan should be reintegrated into mainstream programs as soon as that became feasible. We cannot determine on the record before us whether Ryan's behavioral problems abated during the 1992–93 and 1993–94 school years. Consequently, we reach no conclusion as to whether STARS or a similar self-contained program will be Ryan's least restrictive environment during 1994–95. *Cf. Rachel H.*, 14 F.3d at 1405; *Greer v. Rome City Sch. Dist.*, 950 F.2d 688, 699 (11th Cir.1991).

**7.** This is not a case where school officials failed to provide supplementary services or make rea-

sonable adjustments to accommodate a student's disability. Prior to Ryan's enrollment at Ballou, teachers and staff attended special training sessions designed to educate them about Tourette's Syndrome. ER 120. Ryan received maximum support from the school's special education staff, attending small group "resource classes" for each of his academic subjects. ER 119–20. In addition, Ryan received the assistance of the school's behavioral specialist, who secured standing permission for Ryan to leave class whenever he needed time to relieve his "tics" in private. The school designated a special area in the nurse's office for this purpose. ER 123.

ence embarrassment, fear, anxiety and loss of self-confidence, which in turn can lead to diminished opportunities for social and educational growth). Moreover, school officials might reasonably be concerned about liability for failing to remedy peer sexual harassment that exposes female students to a hostile educational environment.[8]

The record supports the district court's finding that Ryan's behavioral problems interfered with the ability of other students to learn. Disruptive behavior that significantly impairs the education of other students strongly suggests a mainstream placement is no longer appropriate. *See* 34 C.F.R. § 300.-552, Comment. While school officials have a statutory duty to ensure that disabled students receive an appropriate education, they are not required to sit on their hands when a disabled student's behavioral problems prevent both him and those around him from learning.

Weighing these elements together, we conclude that STARS was Ryan's least restrictive environment. *See Daniel R.R.*, 874 F.2d at 1050–51.[9]

### Conclusion

Though the doors to federal courts are always open, the slow and tedious workings of the judicial system make the courthouse a less than ideal forum in which to resolve disputes over a child's education. *See* Perry A. Zirkel, *Over–Due Process Revisions for the Individuals with Disabilities Education Act*, 55 Montana L.Rev. 403, 406–07 (1994) (noting that parties are often unable to achieve satisfactory results through litigation

under the IDEA). Ryan's experience offers a poignant reminder that everyone's interests are better served when parents and school officials resolve their differences through cooperation and compromise rather than litigation.[10]

The judgment of the district court is **AFFIRMED.**

---

8. *See, e.g., Doe v. Petaluma City Sch. Dist.*, 830 F.Supp. 1560, 1571 (N.D.Cal.1993) (holding that, where intentional discrimination is shown, schools can be held liable for monetary damages under Title IX, 20 U.S.C. § 1681 et seq., for failing to eradicate hostile environment caused by peer sexual harassment); Kristina Sauerwein, *A New Lesson in Schools: Sexual Harassment Is Unacceptable*, L.A. Times, Aug. 1, 1994, at E1 (noting that plaintiff in *Doe* will seek $1 million in damages at trial set for early next year); *see also* Tamar Lewin, *Students Seeking Damages for Sex Bias*, N.Y. Times, July 15, 1994, at B7 (suit for peer sexual harassment filed against school district in Albany, N.Y., by 12–year–old female student).

9. Though the parties didn't specify the cost of hiring a classroom aide for Ryan, this fourth factor is irrelevant in light of the district court's finding that an aide would not have materially

improved Ryan's ability to benefit from his placement at Ballou.

10. Ryan has now spent two years in a self-contained program originally intended to serve as a short-term interim placement. The parties' unfortunate inability to reach agreement has resulted in legal expenses of over $100,000 for the school district alone—money that might have been better spent improving educational opportunities for Ryan and other disabled students. This is surely a case where the lawyers would have better served their clients—and the interests of society—had they concentrated their efforts on being healers and mediators rather than warriors. *See, e.g.,* Warren E. Burger, *The Role of the Lawyer Today*, 59 Notre Dame L.Rev. 1, 2 (1983) ("In their highest role, lawyers should be the healers of conflicts and, as such, should help the diverse parts of a complex, pluralistic social order function with a minimum of friction.").