82 F.3d 1493
 109 Ed. Law Rep. 55, 96 Cal. Daily Op. Serv. 3319,
96 Daily Journal D.A.R. 5406
 SEATTLE SCHOOL DISTRICT, NO. 1, a municipal corporation,
Petitioner-Appellant,
v.
B.S., as parent of A.S., a minor, Respondent-Appellee,
and
Office of the Superintendent of Public Instruction, of the
State of Washington; Department of Social &
Health Services Economic & Medical
Service, Respondents.
 No. 94-36153.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 5, 1995.
Decided May 10, 1996.
 
 Lawrence B. Ransom and Karr Tuttle Campbell, Seattle, Washington, for petitioner-appellant.
 Howard C. Powers, Seattle, Washington, for respondent-appellee.
 Appeal from the United States District Court for the Western District of Washington; Barbara J. Rothstein, District Judge, Presiding.
 Before: FLETCHER, KOZINSKI and LEAVY, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 This case involves a dispute over the appropriate educational placement of a disabled child, A.S., under the Individuals with Disabilities and Education Act ("IDEA"), 20 U.S.C. § 1400-1409. The Seattle School District appeals the decision of the district court affirming the Administrative Law Judge's decision that the School District violated the procedural requirements of the IDEA and failed to provide A.S. a free appropriate public education under the Act. Accordingly, the School District was ordered to reimburse A.S.'s parent the cost of an independent evaluation, to pay for A.S.'s placement at a residential facility in Montana, and to pay the parent's attorneys' fees and costs.
 
 
 2
 We have jurisdiction, 28 U.S.C. § 1291, and affirm.
 
 BACKGROUND
 A. Procedural History
 
 3
 After A.S. was expelled from school and temporarily hospitalized in a psychiatric facility for severe behavioral and emotional problems, the Seattle School District identified her as emotionally and behaviorally disabled and thereby qualifying for special education and related services under the IDEA. The School District did not propose placing A.S. in a residential school, contending that mainstreaming in the regular school environment was preferable.
 
 
 4
 Dissatisfied with this assessment, A.S.'s parent, B.S., requested an independent evaluation at public expense. The School District denied this request and initiated an administrative proceeding to establish the appropriateness of its evaluation and, consequently, that it did not have a duty to pay for an independent evaluation at the parent's request. The parent requested a hearing to challenge the School District's refusal to place A.S. in a residential school. The matters were consolidated and a 5-day administrative hearing held.
 
 
 5
 The parent prevailed on all claims. The ALJ found that the School District's evaluation was deficient, that B.S. was entitled to reimbursement of the cost of the independent evaluation, that the School District's proposal for educating A.S. was deficient, that Intermountain Children's Home in Montana was an appropriate placement, and that the School District must pay for A.S.'s residential placement at Intermountain (except for the costs of medical care).
 
 
 6
 The School District appealed the decision by filing a civil action in district court pursuant to 20 U.S.C. § 1415(e). After reviewing the administrative record and conducting a four day bench trial, the district court affirmed the ALJ's decision in its entirety. In its oral ruling, the district judge commented that her "decision is not one that was a close call." The district court awarded B.S. attorneys' fees and costs.
 
 B. Factual Background
 
 7
 A.S. was born on October 7, 1982. She has a history of early neglect, physical and sexual abuse, abandonment, and placement in several foster homes, which experts have identified as a cause of her emotional and behavior problems. She has been diagnosed as having an attachment disorder, an oppositional defiant disorder, a conduct disorder, and a histrionic personality. She has resided with her adoptive mother, B.S., within the Seattle School District, since September 1989.
 
 
 8
 At school, A.S. exhibited frequent behavioral problems, including physical and verbal aggression, oppositionality, tantrums, attention difficulties, and the showing of inappropriate affection toward adults. A.S. was referred to the School District for evaluation of a suspected disability in April 1990, but the District's assessment team did not identify a disability. Nonetheless, the School District attempted to cope with A.S.'s difficulties by providing individual staff attention, reinforcement for positive behavior, and other means of intervention. A.S. was placed in a special education classroom for students with serious behavioral disabilities. B.S. privately secured individual and family counseling for A.S.
 
 
 9
 In spite of these and other attempts at intervention, A.S.'s problems at school worsened. A.S. continued to exhibit physical and verbal aggression, lying, stealing, and oppositional behavior.
 
 
 10
 A.S.'s therapists ultimately concluded that a day program supplemented by counseling was insufficient. They recommended a residential facility with a therapeutic environment. In March 1992, B.S. sought an evaluation by Dr. Vera Fahlberg, a physician, who recommended placing A.S. in a residential setting employing strategies to address A.S.'s attachment difficulties and behavioral concerns. She identified Intermountain Children's Home in Montana as the nearest known program which met A.S.'s needs. This recommendation was supported by A.S.'s therapists.
 
 
 11
 By the fall of 1992, A.S.'s behavioral problems had escalated. School staff gave A.S. individual attention and attempted various interventions, including removal from class. A.S. became isolated from other children. Her problems seriously affected her ability to benefit from classroom instruction. In December 1992, A.S. became so verbally and physically assaultive that she was placed in restraints and taken to Fairfax Hospital. Based on her behavior, A.S. was expelled from school. She was discharged from the hospital in March 1993. As the School District had expelled her, A.S. remained out of school through the end of the school year. In May 1993, Dr. Springer, A.S.'s pediatrician, wrote the School District recommending that A.S. be placed in a residential facility to allow her to acquire the emotional skills necessary for attachment to others and to make use of her cognitive abilities.
 
 
 12
 In May 1993, the School District reevaluated A.S. and concluded that she was seriously behaviorally disabled and eligible for special services. It noted that in spite of A.S.'s age-appropriate academic scores on standardized tests, A.S. had long exhibited behaviors which adversely affected her educational performance. The evaluation did not address the question of A.S.'s need for residential placement.
 
 
 13
 B.S. and the School District failed to agree on A.S.'s placement during two individualized education program (IEP) meetings held in June 1993. The School District rejected residential schooling, proposing instead a specialized self-contained behavioral classroom with counseling services, to be provided during the regular school day. Disagreeing with this recommendation, and believing the School District's evaluation to be deficient, B.S. sought an independent assessment from Dr. Ulrich Schoettle, a child psychiatrist. The School District refused to pay for this assessment. Dr. Schoettle concluded that A.S. was unable to progress outside a residential school environment.
 
 
 14
 As of the time of the administrative hearing, A.S. had received no educational services for six months. B.S. asked the School District to provide private tutoring pending the hearing decision. The School District refused, and B.S. obtained an order from the ALJ requiring the District to provide tutoring.
 
 
 15
 At the administrative hearing, Drs. Fahlberg, Schoettle, and Springer testified that the severity of A.S.'s disability affected her ability to participate in learning activities at school and to make productive use of what she might learn. Each recommended placement in a residential school as soon as possible, noting that they rarely made such a recommendation. Each concluded that A.S. was unlikely to derive any meaningful educational benefit from the School District's proposed day program, as only a residential school could provide the intensity, structure, and consistency necessary for A.S. to progress.[1] The ALJ agreed, and ordered the School District to pay for A.S.'s placement at Intermountain.
 
 
 16
 The School District filed suit in district court, seeking to overturn the ALJ's decision. Shortly thereafter, A.S. enrolled at Intermountain, where she has gradually made progress. At the time of trial before the district court, A.S. had been enrolled at Intermountain for seven months.
 
 
 17
 The district court reviewed the administrative record and entertained additional testimony. The School District introduced the testimony of one medical expert, Dr. William Sack, whom the district court found to be well-qualified but not as familiar with A.S. as the parent's experts. The School District's primary witness was Jody Decker, the tutor that the ALJ had ordered the School District to hire. Although Decker testified that the tutoring situation with A.S. was progressing, the district court found this situation irrelevant to predicting A.S.'s future, as the School District proposed mainstreaming, not private one-on-one tutoring. The district court agreed with the conclusions reached by the ALJ and affirmed the administrative decision. The court found that the ALJ's decision was complete and thoughtful and its reasoning careful and accurate. The court noted that it would arrive at the same conclusions and reach the same result independently.
 
 STANDARD OF REVIEW
 
 18
 The School District had the burden of proving compliance with the IDEA at the administrative hearing, including the appropriateness of its evaluation, 34 C.F.R. § 300.503(b), and its proposed placement for A.S. Clyde K. v. Puyallup Sch. Dist., 35 F.3d 1396, 1398 (9th Cir.1994). As the party challenging the administrative ruling, the School District also had the burden of proof in district court. Id. at 1399.
 
 
 19
 There is both a procedural and a substantive test to evaluate compliance with the IDEA. Reviewing courts must inquire
 
 
 20
 First, has the State complied with the procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?
 
 
 21
 Board of Educ. v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982) (footnote omitted).
 
 
 22
 In evaluating a complaint under the IDEA, the district court "shall receive the record of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). The Ninth Circuit has interpreted this as calling for de novo review. Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 428, 130 L.Ed.2d 341 (1994). However, it has cautioned that this court, like the district court, must give deference to the state hearing officer's findings, particularly when, as here, they are thorough and careful. Id. This court also "must give 'due weight' to judgments of education policy when [we] review state hearings.... [C]ourts should not substitute their own notions of sound educational policy for those of the school authorities which they review." Id. (quotation omitted).
 
 
 23
 The district court's findings of fact are reviewed for clear error and its conclusions of law are reviewed de novo. The appropriateness of a special education placement under the IDEA is reviewed de novo. Sacramento City Unified Sch. Dist. v. Rachel H., 14 F.3d 1398, 1402 (9th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 2679, 129 L.Ed.2d 813 (1994). However, the district court's factual determination that a student is incapable of deriving educational benefit outside of a residential placement is reviewed for clear error. Id. (citing Ash v. Lake Oswego Sch. Dist., 980 F.2d 585, 588 (9th Cir.1992)). To the extent the district court's findings are based on determinations regarding the credibility of the witnesses, "Rule 52(a) demands even greater deference to the trial court's findings." Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).
 
 DISCUSSION
 
 24
 This appeal presents three primary issues: (1) whether the School District was required to pay for Dr. Schoettle's independent evaluation of A.S.; (2) whether the School District was required to pay for A.S.'s placement at Intermountain or whether an alternative proposal provided A.S. a free appropriate public education; and (3) whether A.S.'s parent was entitled to attorneys' fees.
 
 
 25
 A. The Adequacy of the School District's Evaluation and A.S.'s Right to an Independent Evaluation
 
 
 26
 The School District challenges the district court's conclusion that its evaluation of A.S. was deficient and, therefore, that B.S. was entitled to reimbursement of the cost of an independent evaluation by Dr. Schoettle.
 
 
 27
 The IDEA imposes an affirmative obligation on the School District to identify and evaluate children with disabilities. See 34 C.F.R. § 300.128; Wash. Admin. Code § 392-171-341; Ash, 980 F.2d at 589. The district court and ALJ properly concluded that the School District failed to include on the assessment team anyone with knowledge in the disorders known to be the cause of A.S.'s problems. This was contrary to the School District's duty to "ensure ... [that the] evaluation [of the student] is made by a multidisciplinary team ... including at least one teacher or other specialist with knowledge in the area of suspected disability." Smith, 15 F.3d at 1523 (quoting 34 C.F.R. § 300.532(e)). Moreover, the School District failed to reconcile the parent's experts' recommendation that A.S. be placed in a residential facility. The District summarily concluded that a day program was educationally appropriate for A.S. without even addressing the fact that medical experts had concluded residential placement was necessary. See Wash. Admin. Code § 392-171-366 (requiring reconciliation of inconsistent opinions).[2]
 
 
 28
 Because A.S.'s parent disagreed with the School District's evaluation and the District was unable to establish the appropriateness of its evaluation, A.S. was entitled to an independent evaluation at public expense. 34 C.F.R. § 300.503(b). Accordingly, the district court properly affirmed the ALJ's order that the School District reimburse B.S. for the costs of Dr. Schoettle's evaluation.[3]
 
 
 29
 B. The Appropriate Educational Placement for A.S.
 
 
 30
 The IDEA assures all disabled children a "free appropriate public education." 20 U.S.C. §§ 1400(c), 1412(1). It provides federal money to assist states in educating disabled children and conditions such funding upon the state's compliance with extensive goals and procedures. Rowley, 458 U.S. at 179, 102 S.Ct. at 3037.
 
 
 31
 An "appropriate" public education does not mean the absolutely best or "potential-maximizing" education for the individual child.... The states are obliged to provide a basic floor of opportunity through a program individually designed to provide educational benefit to the handicapped child.
 
 
 32
 Smith, 15 F.3d at 1524 (citations omitted). "[T]he 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services...." Rowley, 458 U.S. at 201, 102 S.Ct. at 3048.
 
 
 33
 Disabled children, to the maximum extent appropriate, should be educated with children who are not disabled, i.e., they should be mainstreamed. 20 U.S.C. § 1412(5)(B). The education of a disabled child should take place in the least restrictive environment. 34 C.F.R. § 300.552(d). However, residential placement is appropriate for a disabled child if necessary for her to receive benefit from her education.
 
 
 34
 If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child.
 
 
 35
 34 C.F.R. § 300.302.
 
 
 36
 In determining whether mainstreaming is appropriate, consideration is given to (1) the educational value of placement in a regular class; (2) the non-academic benefits of such; (3) the effect the child has on the class; and (4) the costs of mainstreaming. Rachel H., 14 F.3d at 1404. Consideration of these factors supports the district court's and the ALJ's conclusion that residential placement, rather than mainstreaming, was appropriate for A.S. Witnesses testified that A.S. was not receiving academic or non-academic benefits in a regular classroom. A.S. was severely disrupting the class; the School District had even expelled her. Although the District now contends that "a cost-benefit analysis may very likely support the conclusion that a community based program is appropriate for A.S." it points to no support in the record for this contention. In fact, the School District conceded in its closing argument at trial that "cost is not an issue in this case."
 
 
 37
 Contrary to the School District's assertion, the district court and ALJ did not require the School District to provide A.S. the "best" or "potential-maximizing" education. Rather, they found that A.S. was unable to derive any meaningful educational benefit from her past education and that the School District's new proposal was similarly unlikely to provide educational benefit. Everyone agrees that A.S. is exceptionally bright and thus was able to test appropriately on standardized tests. This is not the sine qua non of "educational benefit," however. "[T]he term 'unique educational needs' [shall] be broadly construed to include the handicapped child's academic, social, health, emotional, communicative, physical and vocational needs." H.R.Rep. No. 410, 1983 U.S.C.C.A.N.2088, 2106. Additionally, the ALJ found that A.S.'s educational progress was actually deteriorating and that she was unable to make productive use of what she learned.
 
 
 38
 At the administrative hearing, each doctor testified that A.S. required residential placement with intensive, round-the-clock care, in order to address her behavioral disabilities and enable her to benefit from her education. They testified that Intermountain's program was appropriate for A.S.'s disabilities, and that they were unaware of any closer appropriate program. No medical expert testified that the School District's proposal was reasonably calculated to provide A.S. an appropriate education.
 
 
 39
 By the time of trial in district court, the School District had retained one medical expert, Dr. Sack, who testified that a day program such as the School District's proposal might meet A.S.'s needs. At this point, however, A.S. had already been at Intermountain seven months and witnesses testified that she was making progress at the school; removing her from the program prematurely could have a highly detrimental effect on her progress. The district court also properly found that, although well-qualified, Dr. Sack had had no personal contact with A.S.,[4] was less knowledgeable about her condition, and testified in terms of broad generalities. The other medical experts, who were well-qualified and more knowledgeable about A.S., all testified that residential placement was necessary.
 
 
 40
 The School District contends that day-schooling should have been attempted before the more restrictive proposal of residential placement was ordered. However, even though the School District had not previously identified A.S. as disabled, it had recognized her serious problems and been attempting various forms of intervention to no avail for several years. A.S.'s problems were becoming progressively more severe. The experts testified that A.S. was at a crucial age and any further delay in getting her appropriate placement would significantly worsen her chances of improvement. The IDEA does not require A.S. to spend years in an educational environment likely to be inadequate and to impede her progress simply to permit the School District to try every option short of residential placement. Cf. 34 C.F.R. § 300.552(d) ("In selecting the [least restrictive environment], consideration is given to any potential harmful effect on the child."); Board of Educ. v. Diamond, 808 F.2d 987, 992 (3d Cir.1986) ("For some students a residential placement may well be the least restrictive.").
 
 
 41
 The School District further contends that even if residential placement was appropriate, the district court erred by not ordering the closest available placement. Dr. Fahlberg testified, however, that Intermountain was the closest known appropriate residential placement. The School District did not satisfy its burden of proposing a specific alternative placement and establishing that it was appropriate for A.S.[5] Thus, it was appropriate for the district court to order that A.S. be placed at Intermountain. See Board of Educ. v. Illinois State Bd. of Educ., 41 F.3d 1162, 1168 (7th Cir.1994) (where school district failed to propose a satisfactory alternative, court "was not required to locate another school that would satisfy the least restrictive alternative requirement based on the entire pool of schools available, but rather was required simply to determine whether that one available choice would provide an appropriate education").
 
 
 42
 Finally, the School District asserts that it should not be responsible for the costs of Intermountain because Intermountain is essentially a "medical" rather than an "educational" program. To the contrary, Intermountain is an accredited educational institution under state law.[6] See Taylor v. Honig, 910 F.2d 627, 633 (9th Cir.1990). Witnesses testified that it is not a psychiatric hospital and is not based on a "medical model." That A.S.'s disability, like most disabilities under the IDEA, stems from medical or psychiatric disorders, 34 C.F.R. § 300.7(b)(1)-(13), and that Intermountain's program addresses these disorders in an attempt to ensure that A.S. is able to benefit from her education, does not render the program invalid or remove the District's financial responsibility. See, e.g., Tilton v. Jefferson County Bd. of Educ., 705 F.2d 800, 803 (6th Cir.1983) ("The concept of education under the Act clearly embodies both academic instruction and a broad range of associated services traditionally grouped under the general rubric of 'treatment.' "), cert. denied, 465 U.S. 1006, 104 S.Ct. 998, 79 L.Ed.2d 231 (1984); 20 U.S.C. § 1401(a)(17) (appropriate educational placement includes "related services," which encompass "such developmental, corrective, and other supportive services ( ... including rehabilitative counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education"). The ALJ's order, affirmed by the district court, expressly limited the School District's financial responsibility to nonmedical costs.
 
 
 43
 Based on these considerations, the district court properly found that the School District's day-schooling proposal was inadequate, that A.S. could not receive an appropriate education outside a residential placement, and that Intermountain was an appropriate placement. Accordingly, the School District was responsible under the IDEA for the nonmedical costs of A.S.'s placement at Intermountain.
 
 C. Attorneys' Fees
 
 44
 The district court awarded B.S. attorneys' fees in the amount of $88,830 and costs in the amount of $7,036. Under the IDEA, the court may award attorneys' fees to "the parents or guardian of a child or youth with a disability who is the prevailing party." 20 U.S.C. § 1415(e)(4)(B). "A prevailing party should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Abu-Sahyun v. Palo Alto Unified School Dist., 843 F.2d 1250, 1252 (9th Cir.1988) (quotation omitted). The School District purports to challenge the award of fees but presents no explanation in support of its contention of error. Accordingly, the issue is waived. Northwest Acceptance Corp. v. Lynnwood Equip., Inc., 841 F.2d 918, 923-24 (9th Cir.1988).
 
 
 45
 B.S. seeks attorneys' fees on appeal under 20 U.S.C. § 1415(e)(4)(B). We grant the request and refer the setting of the amount to the appellate commissioner. See Ash, 980 F.2d at 590 (awarding prevailing parents attorneys' fees incurred in defending School District's IDEA appeal); Barlow-Gresham Union High Sch. Dist. No. 2 v. Mitchell, 940 F.2d 1280, 1283 (9th Cir.1991) (same).
 
 CONCLUSION
 
 46
 The district court properly concluded that the School District's evaluation of A.S. was inadequate, its day-schooling proposal was unlikely to provide A.S. educational benefit, a residential program was the least restrictive alternative appropriate to A.S.'s needs, and Intermountain Children's Home was an appropriate placement. Accordingly, the IDEA required the School District to pay for an independent assessment of A.S. and to pay the nonmedical costs of A.S.'s placement at Intermountain.
 
 
 47
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 No doctor or member of the School District staff expressed an opinion supporting the ability of the District to successfully educate A.S. through the District's day-schooling proposal. Denise Snow, a Fairfax Hospital staff person, who met with A.S. occasionally in a hospital setting, provided support for this option
 
 
 [2]
 State standards that impose a greater duty to educate disabled children, if they are not inconsistent with federal standards, are enforceable in federal court under the IDEA. Smith, 15 F.3d at 1524
 
 
 [3]
 The School District's suggestion that Dr. Schoettle's evaluation did not ultimately support the diagnosis advocated by the parent and that therefore the parent is not entitled to reimbursement is without merit. The parent is entitled to an independent evaluation if the school district's evaluation is deficient. What conclusion the independent expert reaches is irrelevant. In any event, Dr. Schoettle supported the parent's contentions in essential respects: he found that A.S. had severe disorders and he recommended residential placement
 
 
 [4]
 The School District claims that B.S. prevented Dr. Sack from meeting with A.S. but presents no evidence to support this assertion. The School District makes the further unsupported assertion that B.S. did not cooperate with the IEP process. To the contrary, the record reflects that B.S. handled the situation responsibly. She attended two IEP meetings held in June 1993. Disagreeing with the School District's recommendations for A.S.'s schooling, B.S. retained an independent evaluation of A.S. When the School District still refused to consider residential placement, B.S. properly filed a request for an impartial due process hearing under 20 U.S.C. § 1415(b)(2). In any event, the School District's claim that B.S. was not as cooperative as she could have been would be irrelevant even if substantiated. See W.G. v. Board of Trustees, 960 F.2d 1479, 1485 (9th Cir.1992) (rejecting argument that parents are to blame and cannot prevail because they left IEP meeting). It is the School District that has the affirmative duty under the IDEA to provide A.S. a free appropriate public education
 
 
 [5]
 The School District supports its assertion that other appropriate residential placements were available merely by referring to two general letters describing two Seattle programs which make no mention of A.S. or her suitability for the programs. There was no evidence at trial that either program would even accept A.S. Moreover, the School District's assertion that "the parent's own expert, Dr. Vera Fahlberg, testified that Ryther would not be an inappropriate placement for A.S.," is misleading. When asked whether Ryther Child Center would be an appropriate placement for A.S., Dr. Fahlberg responded, "I do not think it would be as good a placement as Intermountain."
 
 
 [6]
 Intermountain is approved by the Washington state education agency for IDEA placements and educates other children from Washington with IDEA funds