**MS. S., for herself and on behalf of her daughter G., Plaintiff–Appellant,**

v.

**VASHON ISLAND SCHOOL DISTRICT; Office of Superintendent of Public Instruction, Defendants–Appellees.**

No. 99–36243.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 2003.

Filed July 31, 2003.

Juliann Brown, Vanessa Soriano Power, and Deirdre Runnette, Dorsey & Whitney, Seattle, WA, for plaintiff-appellant Ms. S, for herself and on behalf of her daughter G.

Christopher L. Hirst, Preston, Gates & Ellis, Seattle, WA, for defendant appellee Vashon Island School District.

Christine O. Gregoire, Attorney General, and David A. Stolier, Assistant Attorney General, Office of the Attorney General, Olympia, WA, for defendant-appellee Office of the Superintendent of Public Instruction.

Before: REINHARDT, W. FLETCHER, and GOULD, Circuit Judges.

GOULD, Circuit Judge.

Ms. S, a mother committed to the education of her disabled daughter, G, brought suit against the Vashon Island School District ("VISD") alleging that the VISD had committed procedural and substantive violations of the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400 (et seq.). Ms. S alleges that the VISD violated the IDEA by proposing a temporary individualized educational placement ("IEP") for G that placed G in a special education classroom, segregated from the general student population. The VISD argues that the temporary placement was appropriate until the VISD had the opportunity to assess and evaluate more fully G's needs and abilities. The district court granted summary judgment to the VISD, holding that the VISD's proposed temporary IEP met the substantive requirements of the IDEA because it was the closest approximation to G's last educational placement, and that any deficiencies in VISD's procedural compliance with the IDEA were "minor and technical." We affirm, concluding that the VISD's efforts to serve G's educational interests complied with the substantive and procedural requirements of the IDEA and satisfied the VISD's obligation to provide a Free Appropriate Public Education ("FAPE") to G.

## BACKGROUND

### I. Seattle School District

#### A. 1992–1993 school year

G, who is currently 17, has Down's syndrome [1] and tested in the "mildly mentally retarded" [2] range on a standard IQ evalua-

---

1. Down's syndrome is a "congenital disorder usually manifested by mental retardation, skeletal deformity, and cardiovascular and digestive problems." *Sullivan v. Zebley*, 493 U.S. 521, 532 n. 10, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

2. The Supreme Court in *Atkins v. Virginia* explained the term "mildly mentally retarded":

 The American Association of Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).

 The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly sub-average general intellectual functioning (Criterion A) that is accompanied by significant limita-

tion at the ages of six and ten. During the 1992–93 school year (kindergarten), Seattle educators, on G's behalf, developed an IEP. This is a special education plan that must be customized for each special education student and that is required by the IDEA. G's IEP included a half day in a regular kindergarten classroom and a half day in a special education classroom, and was implemented at the Bagley Elementary School in Seattle.[3]

Although G was "successful" in the special education classroom, she experienced behavior problems in the general education classroom. G was bossy and demanded frequent attention of both the teacher and her peers, with occasional outbursts. Seattle's Director of Special Education, Frosyne Mensendick, thought that this experience was likely to be indicative of G's future performance, and stated that she could not imagine placing G in a general education classroom. Eventually, at Ms. S's request, Seattle returned G on April 29, 1993 to a full-day program in the self-contained special education class.

## B. 1993–94, 1994–95 school years

On May 18, 1993, in anticipation of the 1993–94 school year (1st grade), Ms. S requested that G be placed in a general education classroom, but Seattle felt that such a placement was inappropriate. In June, G's IEP team agreed to reassign G to Alternative School # 1, which featured an unique and experimental multi-age classroom combining special education and general education students, staffed by a special education teacher and a paraprofessional aide. Ms. S did not sign this IEP, but permitted G to be enrolled in the program. This IEP included a special education curriculum with general education students in G's classroom. Although the form appears to prescribe 1650 minutes per week (5.5 hours per day) of special education *and* 1650 minutes per week of general education, it then shows a "total" of 1650 minutes per week (5.5 hours per day) for the program described above. Because a full school week in the Seattle School District is 1650 minutes per week, and G attended school for only 1650 minutes per week, we assume that the part of the form that reflects the "total" time is correct.

For the 1993–94 school year, G spent most of the day at Alternative School # 1 with twenty-three other students ranging in age from six to ten years old. Of the twenty-three students, five received special education services, and the remaining eighteen received individually tailored gen-

tions in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70.

536 U.S. 304, 308 n. 3, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

**3.** Both parties agree that this case is governed by the IDEA and all relevant administrative regulations as they existed in the summer of 1995, before the IDEA was amended by Congress in 1997. *See* 20 U.S.C. §§ 1400 *et seq.* (1990); *Amanda J. v. Clark County Sch. Dist.,* 267 F.3d 877, 882 n. 1 (9th Cir.2001) (refusing to apply the 1997 amendments retroactively). The IDEA was enacted by Congress "to assure that all children with disabilities have available to them … a free appropriate public education which emphasizes special education and related services designed to meet their unique needs…." *Id.* at 882 (quoting 20 U.S.C. § 1400(c)).

eral education.[4] Although the majority of G's peers in this classroom were general education students, she received individually-designed instruction that was largely prepared by a certified special education teacher. G did not require a dedicated assistant in this classroom. Mensendick did not consider this placement to be a regular education setting.

Although her teacher noted that G had continuing difficulties with appropriate personal space, the placement at Alternative School # 1 was described as generally successful for G. Her teacher indicated that with the proper support, G could be successful in a setting with normally developing peers.

Ms. S and Seattle agreed that G would return to the classroom at Alternative School # 1 for the 1994–95 school year. G, however, was not re-enrolled there. G's regularly scheduled three-year assessment was due in February 1995, but was not conducted at that time. G was released from the Seattle School District on August 22, 1995.

## II. Vashon Island School District

In July 1995, with plans to move to Vashon Island, Ms. S contacted the Vashon Island School District ("VISD") to inquire about enrolling G in a general third-grade classroom at Chautauqua Elementary School, the VISD's only elementary school.

This inquiry began a long series of disputed conversations and letters regarding G's placement in the VISD. The VISD, which was focused on enrolling and assessing G, wanted to place G temporarily in a self-contained special education environment until it could be determined from the assessment whether the temporary placement was appropriate. In contrast, Ms. S was focused on having G placed first in a general education environment, or at the least, having G assessed *before* she was temporarily placed. Because of "stay-put" provisions that Ms. S understood to mandate that a child remain in her last placement during any dispute, Ms. S did not want to have G in self-contained special education while disputes regarding G's education were being resolved.

On September 18, 1995, Lynda Walls, the VISD's Director of Student Services, formally welcomed Ms. S to the district by mailing a letter to her Vashon address. Walls enclosed a form asking for Ms. S's consent to place G temporarily in a self contained special education classroom, for less than thirty days, to evaluate an appropriate permanent placement. Ms. S did not sign the form. On the same day, Ms. S wrote to Walls that the VISD was refusing to assess G until she was placed in the self-contained special education classroom. Ms. S protested that this placement was inconsistent with G's last IEP, and demanded an independent assessment before any placement.

On September 19, Walls sent two letters to Ms. S. The first clarified in writing that the VISD rejected Ms. S's September 1 request for an interdistrict transfer,[5] on

---

**4.** G spent lunch with all other students, and then spent a portion of the afternoon in physical education, art, and movement "electives" with smaller, changing subgroups of other students. Both lunch and the elective periods involved a mix of general education and special education students.

**5.** Ms. S, however, claims that on August 23, Walls informed her that an interdistrict trans-

fer had been verbally approved (although the official transfer request form had not yet been completed) and that the VISD had decided that G would be placed in a self-contained, special education program. Walls claims that options were discussed, but disputes both that the transfer had been approved and that any particular placement offer was made.

the basis that the VISD could not provide the level of service Ms. S was seeking. The second notified Ms. S that even if G had properly been enrolled (presumably as a resident) on September 5, she had since been withdrawn for lack of attendance, and that Ms. S could re enroll G if she planned to send her to Chautauqua Elementary School.[6] The second letter also advised that the psychologist would again attempt to schedule an assessment.

Throughout late September, October, and November, there were several unsuccessful attempts to schedule meetings to evaluate G and to discuss an IEP with Ms. S. The meetings never occurred, according to Ms. S, "[d]ue to VISD's failure to provide proper notice, VISD's refusal to include a general education teacher in any proposed IEP meeting, and G's illness and/or hearing aid difficulties." Also, no assessment occurred, due in part to the lack of the necessary consent form.

On October 20, and again on October 27 and November 3, Walls informed Ms. S that, until G could be assessed for a permanent placement, the VISD would use her last IEP as a guide in developing a temporary IEP. Walls believed that, given the last IEP available and the available options at Chautauqua Elementary School, it was appropriate to place G temporarily in a self-contained special education classroom, with some time in a general education classroom.[7] On October 31, Ms. S again protested the proposed placement, claiming that the district had not explained why it could not accommodate G in an inclusive classroom with general education students and supplemental aids and services, which she claimed reflected G's last

IEP. The VISD special education teacher later testified that she would not have had enough information, using only G's 1993–94 IEP and her last assessment, to tailor the VISD's general education third-grade curriculum to suit G's needs in 1995.

By October 31, VISD had drafted a proposed interim IEP reflecting four hours per day (1200 minutes per week) of special education and at least one hour per day (300 minutes per week) of general education; this amounted to the same quantity of general education time as in G's 1992–93 IEP. Furthermore, the VISD proposed that this time in general education settings be increased "as appropriate and with appropriate support."

On November 7, because of G's continuing absence from school, the VISD filed for a due process hearing (Hearing 95–75, described *infra*) "to show the appropriateness of its proposed placement and program and to overcome [the] refusal to allow [G] to attend."

On November 13, the first full IEP meeting was held. Ms. S claimed to be the only person at the meeting who had had contact with G that was more extensive than a brief introduction, and she felt that a lack of knowledge was apparent in the inappropriate goals the team had provisionally devised. Ms. S continued to be adamant in her demand that, given the disagreement regarding proper placement, G be placed in a general education environment as she claimed was reflected in G's last IEP from Seattle. Ms. S offered as an example Chautauqua Elementary

---

6. On October 11, Ms. S wrote Walls to inform her that she did not intend to re-enroll G; Ms. S maintained that because G was a permanent resident on September 5, the initial enrollment was valid, and remained so.

7. VISD describes this as "placement in the [self-contained] elementary transition program at Chautauqua Elementary School ... with general education to the maximum extent appropriate to [G's] needs, until assessment is complete and [the multidisciplinary team gives a permanent] recommendation."

School's blended second and third-grade multi-age class of 24 students.

At this meeting, it became apparent that the VISD had based its draft IEP on G's 1992–93 IEP, instead of G's 1993–94 IEP.[8] Walls claimed that she had not previously known there was a valid 1993–94 IEP, because it was not included with the materials sent from Seattle. After receiving a copy of the 1993–94 IEP, the VISD altered its proposed plan, including an extra hour per day of special education to more closely match G's 1993–94 IEP. The time spent in general education did not change. The VISD recognized, after being notified by Ms. S, that it was required to implement the 1993–94 IEP, but claimed that Chautauqua Elementary School had no program with the same structure as that in Alternative School # 1, and that the closest available alternative was reflected in the updated draft. On November 22, the VISD invited Ms. S to propose modifications to the altered proposal, and on November 27 Ms. S again communicated her disagreement with the proposed placement.

On December 1, the second full IEP meeting was held. Ms. S proposed changes to the IEP, some of which the VISD included. However, Ms. S and the VISD could not come to agreement on the classroom placement.

The revised draft IEP placed G in a self-contained special education classroom for five hours per day (1500 minutes per week) with 6–10 special education students G's age. For at least one hour per day (300 minutes per week), to be increased if ap-propriate after the assessment, G would join children in a general education setting for activities such as music, physical education, and tutoring. Ms. S continued to object.

No further draft IEP was prepared. The December 1 plan differed from the October 31 plan in three ways: (1) the number of minutes allotted for special—but not general—education (an additional 300 minutes per week as of December 1); (2) the modification of reading, writing, math, communications, language arts, social, and fine motor skills goals to correspond to those in the 1993–94 IEP; and (3) a few corrections to the summary of G's current skill levels to conform to descriptions in the 1993–94 IEP.[9]

On December 15, several days into Administrative Hearing 95–75, discussed *infra*, the Administrative Law Judge ("ALJ") ordered VISD to reassess G. Pursuant to the ALJ's order, VISD reassessed G in January 1996, while Hearing 95–75 was progressing. The assessment team consisted of Walls, Christine Hinds, the principal at Chautauqua Elementary School, the VISD school psychologist, a speech and language pathologist, two Chautauqua Elementary School general education teachers, a Chautauqua special education teacher, a physical therapist, and an occupational therapist. Several members of the team had experience in working with children with Down's Syndrome. The psychologist testified that "the parent was . . . unusually intrusive in

---

8. At oral argument we clarified why the VISD failed to obtain the 1993–1994 IEP when it developed its first proposed temporary IEP:
 THE COURT: How did the mistake come to be realized?
 COUNSEL: It comes to be realized when the . . . parent does agree to meet with [the VISD], and she comes in and says why are you looking at this IEP it's not the most recent one.

 THE COURT: So it's the parent who finally draws the district's attention to that.
 COUNSEL: That's correct.

9. The only differences between the December 1 plan and the 1993–94 IEP consisted of the total amount of time in school and the extent to which that time was characterized as general education or special education.

the assessment process," but the evaluation team agreed to use several tests based on Ms. S's preferences.

After a multifaceted evaluation, the assessment team found that G was mildly mentally retarded, with math, written, and reading comprehension skills approximately three years behind her peers; motor skills, visual perception, and eye-hand coordination at least four years behind her peers; and significant social-emotional problems, including "difficulties with impulsivity, attending to task, stress responses, dependence on adults, and interacting with same-age peers."

On January 26, 1996, the reassessment team met with Ms. S to report the results of the reassessment. Ms. S disagreed with the results of the assessment, which she alleges were "designed to support [the VISD's] proposed interim placement." Given the disagreement and Ms. S's demand that an independent evaluation be conducted at the school district's expense, the VISD on April 29, 1996, filed for another due process hearing. (Hearing 96–34, discussed *infra*).

On February 9, 1996, Ms. S submitted a declaration of intent to home-school her child for the remainder of the school year. There is no evidence in the record indicating that G has since returned to the VISD.

## PROCEDURAL HISTORY

### I. Administrative Hearings

On November 7, 1995 before the IEP process had been completed, the VISD filed for a due process hearing to determine whether the proposed interim placement was appropriate. Ms. S appeared pro se.

### A. Administrative Hearing 95–75

ALJ Lori P. Patton presided over all of the testimony offered at Hearing 95–75, some of which was apparently given via telephone. However, because of a medical emergency, she became unavailable before entering a final order. ALJ Janice A. Grant was substituted under WASH. REV. CODE § 34.05.425.

ALJ Grant listened to imperfect audiotapes of the hearing to reach her decision.[10] On April 26, 1996, ALJ Grant issued an opinion, including a determination that the VISD's witnesses were more credible than Ms. S on disputed material facts. ALJ Grant held that neither Ms. S nor G resided in the district until September 29, when Ms. S began sleeping on Vashon Island, and that the VISD's legal obligations to serve G began only at that time.

Ultimately, ALJ Grant approved the VISD's placement. She agreed with the VISD that Ms. S's preferred placement—a general education third-grade classroom with unspecified supplementary aids and services—would be inappropriate for G. ALJ Grant found that even if placement in a general-education classroom with individually customized curriculum eventually proved appropriate for G, the VISD special education staff would need individual time with G to prepare and tailor this curriculum, and that the interim placement was an appropriate means to provide this time.

Furthermore, ALJ Grant held that, when the parent and the school district disagree on an appropriate placement for a transfer student, the appropriate IEP to implement is the last agreed-upon IEP in the old district. She found that Ms. S's proposal did not approximate G's last agreed placement (the 1993–94 IEP) in Seattle as closely as possible. She further found that the VISD did not have a place-

---

**10.** The tape recorder apparently malfunctioned at least once for an undetermined peri-od, and some limited testimony was inaudible.

ment identical to the Seattle placement, but that the VISD was not required to create one. Rather, the interim placement offered was sufficiently close to the 1993–94 IEP to be appropriate. Because this interim placement was "both procedurally and substantively appropriate for [G]," ALJ Grant held that the VISD "met the procedural and substantive requirements of the federal (IDEA) and state special education laws."

## B. Administrative Hearing 96–34

After Ms. S disputed the VISD's reassessment, the VISD filed for another due process hearing on April 29, 1996. This time, it sought confirmation that its reassessment was appropriate, and that because G was home-schooled, Ms. S was not entitled to an independent evaluation at public expense.

ALJ Cynthia A. Minter judicially noticed the facts found in Hearing 95–75. She conducted a detailed analysis of the relevant provisions of the WASH. ADMIN. CODE,[11] and found that despite delays in certain procedures, the VISD's reassessment substantially conformed to each procedural requirement. Moreover, though

Ms. S disagreed with the methodology used by some of the evaluators, ALJ Minter found nothing improper in the methods of assessment, and specifically credited the expertise of the examiners.

Because ALJ Minter found the reassessment appropriate, she declined to rule on the issue of whether a home-schooled student could demand an independent evaluation at public expense to compensate for an inappropriate assessment. On February 27, 1997, the ALJ entered judgment in favor of the VISD.

## II. Federal Court

Ms. S timely sought review of both proceedings in federal court. Both parties moved for summary judgment. Pursuant to the IDEA's provisions for supplementing the administrative record, the district court agreed to hear and consider any witness Ms. S wished to put forward. An evidentiary hearing for that purpose was held on September 22, 1999.

On October 1, 1999, the district court affirmed the administrative rulings and entered judgment[12] for the VISD and the Office of the Superintendent of Public Instruction ("OSPI").[13] It held that the

11. The chapter of the Washington Administrative Code concerning special education was substantially modified in November 1995. See Wash. St. Reg. 95–21–055 (Order 95–11), effective Nov. 11, 1995. The provisions affecting the VISD's actions through the complaint filing that triggered Hearing 95–75 are found in WASH. ADMIN. CODE ch. 392–171 (1995); the provisions affecting the reassessment addressed in Hearing 96–34 are found in WASH. ADMIN. CODE ch. 392–172 (1996).

12. Some courts, following the normal practice in reviewing an administrative decision, have considered such a judgment to be a grant of summary judgment; some have considered it to be a judgment after a bench trial on a stipulated record (from the administrative hearing) supplemented by additional evidence. We recognized and approved the un-

usual procedure in Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1472 (9th Cir.1993); see also Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891–92 (9th Cir.1995).

13. The OSPI was joined as a defendant when Ms. S appealed the administrative rulings to the district court. Ms. S alleged that OSPI improperly failed to intervene in the dispute between Ms. S and the VISD and that OSPI improperly failed to provide direct educational services to G when the VISD did not give an appropriate placement. Because Ms. S did not raise these arguments directly in her opening brief, upon receiving the brief, OSPI moved to be dismissed as a party. On December 12, 2002, the Appellate Commissioner denied OSPI's motion without prejudice to renewing the arguments in the answering brief. OSPI has now done so, and we assess the issue as follows:

VISD's proposed placement in a segregated special education classroom was the closest approximation to G's last placement, and that any deficiencies in the VISD's procedural compliance with the IDEA were "minor and technical." [14]

On August 12, 2000, this case was dismissed for failure to prosecute the appeal, but after Ms. S explained that she had been waiting for a district court ruling on a motion to produce a transcript at government expense, the appeal was reinstated as to Ms. S on January 22, 2001, and reinstated as to G on August 29, 2002. [15]

In *United States v. Ullah*, 976 F.2d 509 (9th Cir.1992), we explained the standard for considering arguments raised only on reply:

We "will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief." Three main exceptions to that rule exist. First, we will review an issue not present in an opening brief for "good cause shown," FED. R. APP. P. 2, or "if a failure to do so would result in manifest injustice." Second, "[w]e have discretion to review an issue not raised by appellant ... when it is raised in the appellee's brief." Third, we may review an issue if the failure to raise the issue properly did not prejudice the defense of the opposing party.

*Id.* at 514 (internal citations omitted). Here, OSPI briefed applicable arguments in its own reply brief. There is no prejudice to OSPI which cannot be considered to be surprised by arguments it briefed itself. The use of our discretion is appropriate to consider Ms. S's claims against OSPI.

Generally, to gain federal financial assistance under the IDEA, a state must demonstrate that it has policies and procedures in place to ensure that all eligible children receive a FAPE; this includes monitoring and regulatory action by the state educational agency, in Washington the OSPI. WASH. REV. CODE § 28A.155.090 (1995). But the state also has a more specific duty to provide direct services when a local district "refuses or wrongfully neglects to provide a handicapped child with a free appropriate education." *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1492 (9th Cir.1986), *aff'd by an equally divided court sub nom., Honig v. Doe*, 484 U.S. 305, 329, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *see also* 20 U.S.C. § 1414(d)(3) (1991). "The state is not obliged to intervene directly in an individual case whenever the local agency falls short of its responsibilities in some small regard. The breach must be significant ..., the child's parents or guardian must give the responsible state officials adequate notice of the local agency's noncompliance, and the state must be afforded a reasonable opportunity to compel local compliance." *Doe by Gonzales*, 793 F.2d at 1492,

Because we have concluded that the VISD did not substantively deny G a FAPE, and because any procedural violations of the IDEA did not amount to the denial of a FAPE, any failure on the VISD's part does not render the OSPI liable.

**14.** In addition to her claim for violations of the IDEA, Ms. S also claimed damages under Section 504 of the Rehabilitation Act of 1973 ("Section 504") and 42 U.S.C. § 1983. The district court found that both claims were derivative of the IDEA claims, and Ms. S presents no plausible independent basis of recovery. Our holding that there has been no IDEA violation will preclude recovery under either § 504 or § 1983. *See Pasatiempo v. Aizawa*, 103 F.3d 796, 798 (9th Cir.1996) (stating that "compliance with the IDEA's procedures satisfies the requirements of § 504."); *Doe by Gonzales*, 793 F.2d at 1479, 1494 (finding that IDEA's predecessor superceded a § 504 cause of action for the denial of an appropriate education); *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 387 (6th Cir.1992) (stating that § 1983 grants a cause of action for IDEA but does not expand substantive rights). Therefore, we do not independently address Ms. S's claims under § 504 of the Rehabilitation Act or 42 U.S.C. § 1983.

**15.** Ms. S filed pro se a timely notice of appeal, but stated only her own name in the caption, and used the singular term "Petitioner." When the Appellate Commissioner dismissed and then reinstated her case, it was at first reinstated only as to Ms. S and not as to G. On August 29, 2002, the Appellate Commissioner reconsidered, and reinstated the appeal as to both Ms. S and G. The VISD opposed reinstating G, on grounds that G was not listed on the notice of appeal. On October 15, 2002, we confirmed reinstatement of G, but allowed the VISD to renew its objection in its brief on the merits. It has now done so.

## STANDARD OF REVIEW

 The standard of review in cases involving the IDEA is different from the standard normally employed by federal courts reviewing the decisions of administrative agencies. The IDEA itself allows federal courts to receive evidence in addition to that put forth at the administrative hearing, and to weigh this additional evidence equally. *See* 20 U.S.C. § 1415(e)(2) (1990). Accordingly, appellate courts give less deference than is normally the case to the administrative law judge's findings of fact. "Complete *de novo* review, however, is inappropriate. . . . Because Congress intended states to have the primary responsibility of formulating each individual child's education, we must defer to their 'specialized knowledge and experience' by giving 'due weight' to the decisions of the states' administrative bodies." *Amanda J.*, 267 F.3d at 887–88 (internal citations omitted). The "due weight" to be given is within the discretion of the appellate court.[16] *Union Sch. Dist. v. B. Smith*, 15

---

FED. R. APP. P. 3(c)(2) states that "[a] pro se *notice of appeal is considered filed on behalf of the signer and the signer's spouse and minor children (if they are parties), unless the notice clearly indicates otherwise."* The VISD argues that (1) G was adequately represented by counsel when the notice of appeal was filed, and (2) Ms. S's designation of only herself and use of the singular term "Petitioner" clearly indicated that she intended to file the appeal only for herself. As to the VISD's first argument, we conclude that when the notice of appeal was filed, neither Ms. S nor G was for practical purposes represented by counsel and that both therefore fell under FED. R. APP. P. 3(c)(2). In an affidavit filed October 18, 1999, Ms. S requested leave for appointed pro bono counsel to withdraw, and for appointment of new counsel on appeal. This was construed as a motion for appointment of new counsel, and denied on December 13, 1999. Previously-appointed counsel told Ms. S on December 17 that he would no longer be representing her, pursuant to Ninth Cir. Pro Bono R. 4. This rule states that appointed counsel must represent the client until final judgment is entered and that counsel is encouraged but not required to continue representation thereafter. On December 21, 1999, Ms. S purportedly filed pro se her notice of appeal. Ms. S's notice of appeal neglected to state that she was appealing on G's behalf as well.

Fearing that a parent's mistakes may prejudice the rights of the child, we have held that a non-attorney parent "cannot bring an action on behalf of a minor child without retaining a lawyer." *Johns v. County of San Diego*, 114 F.3d 874, 877 (9th Cir.1997). We also declared that "[t]he infant is always the ward of every court wherein his rights or property are brought into jeopardy, and is entitled to the most jealous care that no injustice be done to him." *Id.* (internal quotation marks omitted). We declined to prejudice the rights of the child by the father's error. *Id.* We adopt the same approach here. Although appointed counsel may have been obligated by the district court's order to continue representation past the deadline in the Pro Bono rules, he did not assist in the preparation of the notice of appeal. For the limited purpose of this jurisdictional notice, Ms. S was constructively proceeding pro se, and her notice of appeal was sufficient under the liberal pleading rules of FED. R. APP. P. 3(c)(2).

As to the VISD's second argument, the latitude conveyed by FED. R. APP. P. 3(c)(2) complies with the Supreme Court's admonition that a pro se litigant should be held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Morrison v. Hall*, 261 F.3d 896, 899 n. 2 (9th Cir.2001). There is no indication that Ms. S intended to file only on her own behalf. There is only G's absence from the notice of appeal. We conclude, pursuant to FED. R. APP. P. 3(c)(2), that Ms. S's notice of appeal was filed on behalf of both herself and G, and that G's appeal was properly reinstated by the Appellate Commissioner.

16. We have defined the evaluation of "due weight" as follows:

The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such con-

F.3d 1519, 1524 (9th Cir.1994). As relevant to this case, the factual determinations afforded "due weight" include the ALJ's finding as to: (1) the academic benefits a student would have received from a mainstream placement, (2) the non-academic benefits a student would have received from a mainstream placement, (3) the effects that a student's presence would have had on mainstream teachers and students, and (4) the cost of educating the student in a mainstream classroom. *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1401 (9th Cir.1994).

■ In IDEA cases, the district court may review the ALJ's findings and make its own factual determinations, after granting the ALJ's findings "due weight," on a preponderance of the evidence; the district court's factual findings, even when based on the written record of administrative proceedings, are reviewed for clear error. *Amanda J.*, 267 F.3d at 887; *but see Ojai Unified Sch. Dist.*, 4 F.3d at 1473 (stating that the appellate court grants only "due weight" to the factual findings of the ALJ, even if the district court relied on the administrative proceedings for its own findings). The conclusion of both the ALJ and the district court as to whether a student's placement under the IDEA constitutes a "free appropriate public education" is a legal conclusion reviewed *de novo*. *Clyde K.*, 35 F.3d at 1401; *Seattle Sch. Dist., No. 1, v. B.S.*, 82 F.3d 1493, 1499 (9th Cir.1996); *Amanda J.*, 267 F.3d at 889 n. 11.

■ At the administrative hearing, the school district has the burden of proving that it complied with the IDEA. *Clyde K.*, 35 F.3d at 1398. In the district court and on appellate review, however, the burden of proof is on the party challenging the administrative ruling. *Id.* at 1399.

## DISCUSSION

### I. Credibility Determinations

Before reaching the merits of Ms. S's claims under the IDEA, we examine whether credibility determinations were properly made by the substitute ALJ. Normally, a finder of fact's determination of credibility receives deference on appeal, because access to live testimony is important to the credibility finding. As we stated in *United States v. Mejia:*

> There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility. As the Supreme Court stated in *Anderson v. City of Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518[ ] (1985): "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575, 105 S.Ct. 1504[.] Live testimony enables the finder of fact to see the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice—matters that cannot be gleaned from a written transcript. Because the district judge is able to hear testimony live and to view the witnesses as they testify, his credibility findings are entitled to deference on appeal.

69 F.3d 309, 315 (9th Cir.1995) (internal citations omitted); *see also Amanda J.*, 267 F.3d at 889 (finding, in the IDEA context, that the administrative hearing officer "who receives live testimony is in

sideration, the court is free to accept or reject the findings in part or in whole. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir.1987). *See also Ojai Sch.*

*Dist. v. Jackson*, 4 F.3d 1467, 1473–74 (9th Cir.1993).

the best position to determine issues of credibility").

Although some aspects of testimony important to a credibility finding—such as the tone of a witness's voice—may be conveyed through audiotapes alone, other key factors can be assessed only if one goes beyond the capacity of an aural medium. *Mejia* mentions the "witness's physical reactions" and "variations in demeanor." *Id.* Also, in response to a question, a witness may fidget, or blush, or sweat, or frown, or grin, or shift his eyes nervously about, or look for assistance to his counsel or to a friend in the audience—but none of these reactions will be conveyed on the audiotape. Without the ability to assess these reactions, a factfinder's ability to determine a witness's credibility reliably is constrained.

Indeed, in *Mejia* we found that, when credibility was an issue in the case, a district judge's finding of fact "without observing critical witnesses or hearing them testify in person" was sufficiently without foundation to warrant reversal of the denial of a motion to suppress. *Id.* at 317; *cf. Patelco Credit Union v. Sahni,* 262 F.3d 897, 906 (9th Cir.2001) (noting that under Rule 63, a judge succeeding an unavailable judge after trial may only make findings of fact without a new trial if credibility is not at issue).

In this case, ALJ Patton heard the testimony of Hearing 95–75; though some witnesses apparently testified by phone, most testimony was live. The complexity of gauging witness demeanor was compounded by the fact that Ms. S appeared *pro se* and both asked and answered her own questions. She could, and often did, in this manner blur the line between question and answer. Although ALJ Patton heard this testimony live, she suffered a medical emergency before she could issue findings of fact, and ALJ Grant turned solely to audiotapes to determine the credibility of the parties. Moreover, ALJ Grant's credibility determinations were material; much of Ms. S's case turns on whether the school district's witnesses could be believed in their assertions that they attempted to involve Ms. S in the IEP process and that they contemplated G's initial placement to be a temporary placement only.

We conclude that ALJ Grant's determination that the district's witnesses were more credible than Ms. S, based solely upon her review of audiotapes of live testimony, is due little deference. But even if reliance on these credibility determinations was error, the error was harmless. As the IDEA requires, *see* 20 U.S.C. § 1415(e)(3)(A) (1990); *Amanda J.,* 267 F.3d at 887, the district court here granted Ms. S the opportunity to supplement the record of the administrative hearings with any additional non-cumulative testimony.[17] Ms. S therefore could have recalled any witness—including herself—if she thought that demeanor evidence could have result-

17. The district court gave four reasons for allowing supplemental testimony: "[I]f (1) there are gaps in the transcript due to mechanical failure, (2) witnesses were unavailable during the administrative hearing, (3) evidence was improperly excluded, or (4) relevant events occurred after the administrative hearing." The district court did not state that it would accept testimony specifically to reconsider credibility rulings, and affirmatively mentioned that "[w]itnesses who testified during the administrative hearing ... should not be allowed to repeat or embellish upon their testimony," which might have led Ms. S to believe that she could not recall witnesses from the hearing itself for credibility purposes. However, the district court did "grant Ms. S leave to call every witness listed in her request," and Ms. S does not now claim that she was denied the opportunity to present testimony that would have helped her overturn ALJ Grant's allegedly improper credibility determination.

ed in a different credibility finding. She presented both additional witnesses and additional exhibits, and also recalled herself to present further testimony. Moreover, in its findings of fact, the district court did not explicitly rely on the ALJ's credibility determinations. Because the district court gave Ms. S the opportunity to cure any erroneous credibility determination, and because the district court did not itself rely on any erroneous credibility determination, any error by ALJ Grant was harmless.

## II. IDEA

### A. Procedural Compliance

The Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* (1990), guarantees to all children with disabilities a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1412(1) (1990). The Supreme Court has held that "a court's inquiry in suits brought under [the IDEA] is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (footnote omitted);[18] *see also Amanda J.*, 267 F.3d at 890.

Compliance with the IDEA procedures is "essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful paren-

tal participation are particularly important." *Amanda J.*, 267 F.3d at 891. "When the elaborate and highly specific procedural safeguards embodied in [the IDEA] are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid." *Rowley*, 458 U.S. at 205, 102 S.Ct. 3034.[19] Furthermore, a school district must comply not only with federal statutory and regulatory procedures, but with state regulations as well: "State standards that are not inconsistent with federal standards [under the IDEA] are also enforceable in federal court." *W.G. v. Bd. of Trustees*, 960 F.2d 1479, 1483 (9th Cir. 1992); *see also B.S.*, 82 F.3d at 1499 n. 2.

Yet, as we have recognized, there is some leeway in the procedural requirements:

> Not every procedural violation, however, is sufficient to support a finding that the child in question was denied a FAPE. Technical deviations, for example, will not render an IEP invalid. On the other hand, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, clearly result in the denial of a FAPE.

*Amanda J.*, 267 F.3d at 892 (internal citations and quotation marks omitted).

18. *Rowley* concerned the Education of the Handicapped Act ("EHA"), the precursor to the IDEA. The name of the act was changed to the IDEA effective October 1, 1990. Education of the Handicapped Act Amendments of 1990, Pub.L. No. 101–476, § 901(a), 104 Stat. 1103, 1141–42 (1990).

19. As the Fifth Circuit has said, "The Act's procedural guarantees are not mere procedural hoops through which Congress wanted state and local educational agencies to jump. Rather, 'the formality of the Act's procedures is itself a safeguard against arbitrary or erroneous decision making.'" *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1041 (5th Cir.1989) (quoting *Jackson v. Sch. Bd.*, 806 F.2d 623, 630 (5th Cir.1986)).

Ms. S alleges four procedural violations of the IDEA:

First, Ms. S claims that the VISD violated 34 C.F.R. § 300.342 (1995), 34 C.F.R. Pt. 300 app. C (1995), and WASH. ADMIN. CODE §§ 392–171–457 (1995) by failing to have an IEP in place "at the beginning of the school year." Second, Ms.S claims that the VISD violated 34 C.F.R. § 300.345 (1995), which mandates that school districts "take steps to ensure that one or both of the parents . . . are afforded the opportunity to participate" in IEP meetings. Third, Ms. S claims that the VISD failed to implement G's last agreed-upon IEP during the pendency of Hearing 95–75, in violation of 20 U.S.C. § 1415(e)(3) (1995). Fourth, Ms. S claims that the VISD attempted to schedule the first meeting to "initiate or change" G's placement on September 1, without prior written notice, contrary to statutory and regulatory command.

We address each alleged procedural violation in turn.

■ 1. Ms. S first claims that the VISD violated the procedural requirements of the IDEA by failing to have an IEP in place "at the beginning of the school year."

The interpretive guidelines for the IDEA regulations issued by the Office of Special Education Programs ("OSEP"), the agency charged with administering IDEA, specify that "[i]f a child with a disability has been receiving special education in one [district] and moves to another community," the new district may implement the last IEP from the old district; if the last IEP is unavailable or if the new district believes the last IEP to be inappropriate or not feasible to implement as written, then the new district must conduct a meeting to develop a new IEP. *See* 34 C.F.R. Pt. 300 app. C, no. 6 (1995). This meeting should normally take place within one week after the child enrolls in the new district. *See id.*

The interpretive guidelines also state that "[i]f the [district] or the parents believe that additional information is needed . . . or that a new evaluation is necessary before a final placement decision can be made, it would be permissible to temporarily place the child in an interim program"; to ensure that the temporary placement does not become a final placement, the district may develop an interim IEP with a "specific timeline (e.g., 30 days) for completing the evaluation and making judgments about the most appropriate placement for the child." 34 C.F.R. Pt. 300 app. C, nos. 5–6.

■ All of these alternative obligations—the implementation of the last IEP, the new IEP meeting, and the temporary interim placement—are triggered by the transfer student's enrollment in the new district. Although neither federal nor state regulations specify when a child "enrolls" for purposes of the IDEA, Washington state regulations do determine when a child enrolls for purposes of apportioning money to the school districts. As relevant to this case, a student is "enrolled" if he or she "resides" in the school district, actually participated in a course of instruction on a school day during the current school term before the date in question, and neither dropped out nor was absent for more than twenty consecutive school days. WASH. ADMIN. CODE §§ 392–121–106(1)(a),– 106(4)–(5), –108(1)–(2) (1995). In turn, a student "resides" in the school district if the "physical location of[the] student's principal abode . . . where the student lives the majority of the time" is in the district. WASH. ADMIN. CODE § 392– 137–115 (1995). The student's mailing address and principal abode may be different. *Id.* If a student has no legal residence at all, the school district must enroll

the student at the parent's request. WASH. REV. CODE § 28A.225.215 (1990).

Because it is undisputed that G never attended a day of class, we conclude that G was not "enrolled" in the VISD, until at least September 18, when the VISD offered an interim placement for evaluation purposes with a clearly identified thirty-day time limit, satisfying its obligation under 34 C.F.R. Pt. 300 app. C, nos. 5–6.[20] Because the VISD had an IEP in place "at the beginning of the school year" the VISD did not violate 34 C.F.R. § 300.342 (1995), 34 C.F.R. Pt. 300 app. C (1995), and WASH. ADMIN. CODE §§ 392–171–457 (1995).

■ 2. Ms. S also claims that the VISD effectively came to a unilateral conclusion on G's placement before involving Ms. S or reviewing G's records, and that the VISD maintained its insistence on a predetermined placement despite substantial parental protest.

■ Denying parental access to the IEP process is a serious procedural violation of the IDEA. As we explained in *Amanda J*:

Among the most important procedural safeguards are those that protect the parents' right to be involved in the development of their child's educational plan. Parents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know.

*Amanda J.*, 267 F.3d at 882. *See also Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F.3d 1072, 1077–78 (9th Cir. 2003) ("It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard." (quoting *Rowley*, 458 U.S. at 176, 102 S.Ct. 3034)).

For that reason, "procedural inadequacies that . . . seriously infringe the parents' opportunity to participate in the IEP formulation process . . . clearly result in the denial of a FAPE." *Amanda J.* 267 F.3d at 892 (internal quotation marks omitted).

■ A school district violates IDEA procedures if it independently develops an IEP, without meaningful parental participation, and then simply presents the IEP to the parent for ratification. *See W.G.*, 960 F.2d at 1484. "After-the-fact parental involvement is not enough," and a school district may not be excused for lack of parental participation if it "prioritize[s] its representatives' schedules over[those] of [the] parents." *Shapiro*, 317 F.3d at 1078. Also, a school district may not enter an IEP meeting with a "take it or leave it" position, and if it does so, then even the parents' decision not to cooperate thereafter may not excuse the district's error. *See W.G.* 960 F.2d at 1484, 1486; *see also B.S.*, 82 F.3d at 1501 n. 4 (stating that the district would be held liable even if the parent were not "as cooperative as she could have been"). But the VISD has no obligation to grant Ms. S a veto over any individual IEP provision. As we clarified in *Doe by Gonzales*:

In discussing parents' participatory role in developing IEPs for their children, the [Supreme] Court observed that Con-

---

**20.** ALJ Grant found that, because G did not stay overnight in the district until September 29, she did not "reside" there until that date. WASH. ADMIN. CODE §§ 392–121–106(4) (1995). We need not address the date of G's legal residency on Vashon Island because G did not participate in a "course of instruction" at any point.

gress, '[a]pparently recognizing that [a] cooperative approach would not always produce a consensus between the school officials and the parents, and that in any dispute the school officials would have a natural advantage, ... incorporated an elaborate set of what it labeled 'procedural safeguards' to insure the full participation of the parents and proper resolution of substantive disagreements.' We construe the Court's language as a recognition that, although the formulation of an IEP is ideally to be achieved by consensus among the interested parties at a properly conducted IEP meeting, sometimes such agreement will not be possible. If the parties reach a consensus, of course, the [IDEA] is satisfied and the IEP goes into effect. If not, the agency has the duty to formulate the plan to the best of its ability in accordance with information developed at [prior] meetings, but must afford the parents a due process hearing in regard to that plan.

793 F.2d at 1490 (internal citation omitted).

Ms. S claims that the VISD entered the IEP process with a "take it or leave it" position and did not allow meaningful parental participation in the IEP process. She alleges that a unilateral decision was evidenced by the fact that the VISD placed G in a self-contained special education classroom as of September 1, 1995 and that this determination never changed. Moreover, according to Ms. S, the fact that the VISD filed for a due process hearing even before the first official IEP meeting, and the fact that the VISD arrived at this first official meeting, on November 13, 1995, with a "prepared" IEP, shows that the VISD had arrived at a predetermined placement to be implemented without parental input.

However, Ms. S does not acknowledge that, at least by September 18, 1995, the VISD made clear that its proposed initial placement was explicitly temporary, for the purposes of assessing G. G's last assessment was outdated; she had not been in school the prior year; and through September 1995, the VISD did not have a validated copy of any prior IEP, in part because Ms. S did not authorize release of records from Seattle until October 2, 1995. Under these circumstances, the VISD's decision to evaluate G before implementing a program and the VISD's decision to implement a temporary IEP during the VISD's evaluation of G was appropriate.

Furthermore, the regulations permit the district to "temporarily place the child in a [bounded] interim program" in order to conduct a proper evaluation. 34 C.F.R. Pt. 300 app. C, nos. 5–6. The VISD's determination that it would not initially place G in a regular education classroom, when she had previously received special education services, was not a "take it or leave it" offer, but was a legitimate means to assess G's needs and abilities. The VISD's steadfast insistence on an individualized special education environment was appropriate in establishing a temporary placement for evaluation purposes.

After the early encounters in September 1995, the VISD offered Ms. S more opportunity to participate in the process, not less. It attempted to schedule several assessments and several other IEP meetings, notifying Ms. S several days in advance on each occasion. Once the VISD received G's 1992–93 IEP, on October 6, it prepared draft provisions tailored to the goals expressed in that IEP, and when Ms. S later demanded changes to conform to the 1993–94 IEP that the VISD had not received, the district complied by modifying the educational goals accordingly and soliciting further modifications from Ms. S. The only "take it or leave it" feature of the VISD's proposed drafts was the refusal to

place G as an initial matter entirely in a regular education classroom. This reflects a difference of educational philosophy with Ms. S, not a denial of opportunity to participate. School districts have expertise in educational methods that may be given appropriate weight in assessing an IEP's compliance with the IDEA.

■ We hold that where the school district has repeatedly provided the parent with the opportunity to participate meaningfully in the IEP process, the school district has not violated its obligations under 34 C.F.R. § 300.345 (1995), which requires the school district to "take steps to ensure that one or both of the parents ... are afforded the opportunity to participate" in IEP meetings, so long as it affords the parent a subsequent due process hearing with regard to its proposed plan when the parent and the school district are in disagreement about aspects of the proposed plan. *See Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990) ("Strictness [in the IEP process] ... must be tempered by considerations of fairness and practicality...."). Here, the VISD provided a meaningful opportunity for Ms. S to participate in the IEP process, developed an IEP plan to the best of its ability after Ms. S and the VISD could not come to a consensus about an IEP, and afforded Ms. S two due process hearings to establish the validity of its proposed plan. We conclude that the VISD did not violate 34 C.F.R. § 300.345 (1995).

■ 3. Ms. S also claims that the VISD failed to implement her last agreed-upon IEP during the pendency of Hearing 95–75 in violation of 20 U.S.C. § 1415(e)(3) (1995).[21] The section provides that "during the pendency of any proceedings" to resolve a dispute under the IDEA, "the child shall remain in the then current educational placement of such child."[22] *Id.* *See also* 34 C.F.R. § 300.513(a) (1995) (same); 34 C.F.R. Pt. 300 app. C, no. 35. Because there was a dispute about the VISD's proposal, Ms. S claims that the district had the obligation to implement G's last agreed-upon IEP—the IEP from 1993–94—while the new placement was under review.

We have held that, to keep a student in the "then current educational placement," a district typically has the obligation to provide the "placement described in the child's most recently implemented IEP." *Johnson*, 287 F.3d at 1180. This obligation, however, is not absolute. We have held that when a student falls under the responsibility of a different educational agency—for example, when a student becomes old enough to receive services from a school district rather than a preschool provider—the new agency need not provide a placement identical to that provided by the old agency. *Johnson*, 287 F.3d at 1181–82. Although the "stay-put" provision is meant to preserve the status quo, we recognize that when a student transfers educational jurisdictions, the status quo no longer exists. *Id.*

The OSEP has stated that when a student transfers to a new district, and there is disagreement on appropriate placement, the new district must implement the last agreed-upon IEP "to the extent possible."

**21.** The procedural safeguard guaranteeing that a student's education will not be improperly modified during administrative hearings is often called the "stay-put" provision. *See, e.g., Honig*, 484 U.S. at 308, 108 S.Ct. 592; *Johnson ex rel. Johnson v. Special Educ. Hearing Off.*, 287 F.3d 1176, 1179 (9th Cir.2002); *Clyde K.*, 35 F.3d at 1400.

**22.** "Neither the statute nor the legislative history provides guidance for a reviewing court on how to identify 'the then current educational placement.'" *Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 865 n. 13 (3rd Cir.1996).

Letter to Campbell, 213 Educ. for the Handicapped L. Rep. 265 (OSEP Sept. 16, 1989) [hereinafter Letter to Campbell]. "To the extent implementation of the old IEP is impossible, the new district must provide services that approximate, as closely as possible, the old IEP." *Id.* We defer to and adopt the position of the OSEP in the Letter to Campbell because the OSEP is the agency responsible for monitoring and administering the IDEA and because the Letter to Campbell comports with the purposes of the IDEA.[23] *See Honig,* 484 U.S. at 325 n. 8, 108 S.Ct. 592. We hold that when a dispute arises under the IDEA involving a transfer student, and there is disagreement between the parent and student's new school district about the most appropriate educational placement, the new district will satisfy the IDEA if it implements the student's last agreed-upon IEP; but if it is not possible for the new district to implement in full the student's last agreed-upon IEP, the new district must adopt a plan that approximates the student's old IEP as closely as possible. The plan thus adopted will serve the student until the dispute between parent and school district is resolved by agreement or by administrative hearing with due process.

In this case, while Hearing 95–75 was pending, the VISD first attempted to approximate, and then replicated precisely, the educational goals contained in G's 1993–94 IEP, the last agreed-upon IEP. At Ms. S's insistence, the December 1, 1995 IEP reflected precisely the same goals as the 1993–94 IEP, even though G had been out of school for a full year in the interim, presumably gaining certain skills and relapsing in others. The VISD did not, however, precisely replicate the

educational environment of Alternative School # 1, the site of G's 1993–94 IEP. From the record it appears that the Alternative School # 1 classroom represented an educational environment unique in Washington, featuring an individually-tailored curriculum delivered by certified special education professionals in a largely "mainstreamed" social classroom. Also, the VISD special education teacher testified that although she could have designed an individually-tailored curriculum for G's use in a general education classroom after observation in a special education context, she would have been unable to do so if G had simply been placed in a mainstream classroom from the first day.

Given the IDEA's explicit requirement of both an individually-appropriate curriculum, *see* 20 U.S.C. § 1401(a)(16), (20) (1995), and social mainstreaming to the "maximum extent appropriate," *see* 20 U.S.C. § 1412(5), both the curriculum and the environment stake strong claims to be essential attributes of an IEP. *Cf. Rowley,* 458 U.S. at 197 n. 21, 102 S.Ct. 3034 ("The use of 'appropriate' in the language of the Act, although by no means definitive, suggests that Congress used the word as much to describe the settings in which handicapped children should be educated as to prescribe the substantive content or supportive services of their education."). In most cases, there is an obvious tension between the two. *See Daniel R.R.,* 874 F.2d at 1044. In G's case, there was testimony that, at least as far as an immediate and temporary placement was concerned, the two were mutually exclusive. Over time, it might have been possible to develop individualized curriculum for G in a mainstream environment, but the VISD's special education teacher stated that this

---

**23.** "The [OSEP] is the agency charged with principal responsibility for administering the IDEA," *Michael C. v. Radnor Township Sch. Dist.,* 202 F.3d 642, 649 (3rd Cir.2000), and its interpretive rules therefore receive some deference under *Chevron. See Honig,* 484 U.S. at 325 n. 8, 108 S.Ct. 592.

would not have been possible without an interim evaluation period.

Because implementation of G's last agreed-upon IEP would have been impossible in the VISD, and because the explicitly temporary and malleable nature of the placement that the VISD offered approximated the last agreed-upon IEP as closely as possible under the circumstances, we conclude that the VISD abided by the "stay-put" provisions of the IDEA during the pendency of Hearing 95–75.

4. Finally, Ms. S claims that the VISD attempted to schedule the first meeting to "initiate or change" G's placement on September 1, without prior written notice, contrary to statutory and regulatory command.[24] The VISD does not contend that Ms. S received prior written notice of the September 1 meeting, but disputes that the meeting triggered the VISD's legal obligation to provide notice before proposing to "initiate or change" placement. Ms. S asserts that the VISD's legal obligation to provide notice was triggered because the VISD approved an interdistrict transfer for G on August 23, 1995.

The parties contest G's status as of September 1, 1995. Though neither party contends that G was a Vashon Island resident at that time, Ms. S claims that an interdistrict transfer had been approved on August 23, 1995, and that the September 1, 1995, meeting was therefore a meeting to determine G's placement. The VISD claims that no approval was granted on August 23, 1995, and submits as evidence the uncontroverted fact that Ms. S had not yet completed a transfer request

form at that time. ALJ Grant accepted the VISD's argument, but may have done so because of a faulty credibility determination. *See supra* at 10451–52. The district court did not make a factual finding as to the August 23 conversation, but noted that the VISD stated that it "would not" accept G as a transfer student on Ms. S's terms. This can be construed as an implied factual finding that no August 23 approval took place. We conclude that the district court's finding that G was not accepted as a transfer student as of August 23 is not clearly erroneous.

■ Ms. S further alleges that the VISD improperly attempted to schedule meetings for October 31, 1995 and November 9, 1995, without a general education teacher, over her protests and in violation of 20 U.S.C. § 1401(a)(20) (1990), 34 C.F.R. § 300.344 (1995), and WASH. ADMIN. CODE § 392–171–456 (1995).

20 U.S.C. § 1401(a)(2) requires the presence of the "teacher." We have interpreted the "teacher" language in 20 U.S.C. § 1401(a)(2) to demand the presence of the student's current teacher, even if the teacher is out-of-district. *See Shapiro,* 317 F.3d at 1077. Because G was not enrolled in any district at the time of the scheduled meetings, and indeed, was home-schooled entirely for the preceding year, we conclude that Ms. S's presence, as G's then current home school teacher, sufficed to meet the requirement in 20 U.S.C. § 1401(a)(2).

■ Pursuant to 34 C.F.R. § 300.344 and WASH. ADMIN. CODE § 392–171–

---

24. Ms. S alleges that the VISD's failure violates 20 U.S.C. § 1415(b)(1)(C) (1990) (requiring "written prior notice to the parents" when a school proposes to initiate or change placement); 34 C.F.R. § 300.345 (1995) (requiring notice to the parents "early enough to ensure that they will have an opportunity to attend"), 34 C.F.R. §§ 300.504–.505 (1995) (requiring written notice "a reasonable time" before a school proposes to initiate or change placement); WASH. ADMIN. CODE §§ 392–171–521, –526 (same); and 34 C.F.R. §§ 104.35–.36 (1995) (noting that procedural conformity with the IDEA also satisfies § 504 of the Rehabilitation Act).

456, the school "shall" include the teacher among several enumerated participants in the IEP process, but also "shall" include "[o]ther individuals at the discretion of the [district or parent]." While these federal and state regulatory provisions allow the parent to bring a participant of the parent's choice or the district to bring a participant of its choice, these provisions do not allow the parent to demand that the district bring a non-enumerated individual, or vice versa. Because the regulations do not mandate the VISD to bring a general education teacher to the IEP meeting, we conclude that the VISD did not violate the requirements of § 300.344 or § 392–171–456.

The VISD was also required to notify Ms. S "who will be in attendance," 34 C.F.R. § 300.345(b)(1) (1995), WASH. ADMIN. CODE § 392–171–456(3) (1995), at the October 31, 1995 and November 9, 1995 meetings.[25] Although the VISD's October 27 notice of the October 31 meeting did not describe the attendees, Ms. S canceled the meeting because she had insufficient time to prepare, not because the participants were inadequate. The November 9 notice described the attendees as required by the regulations.

Although there were minor procedural violations in providing notice to Ms. S in the VISD's October 27, 1995, notice of the October 31, 1995, meeting, no harm was done because the VISD's November 9 notice complied with procedural requirements of the IDEA. As we have previously stated, not every procedural violation amounts to a denial of a FAPE. *Amanda*

*J.*, 267 F.3d at 892. We conclude that the VISD's technical errors did not amount to a procedural violation that denied G a FAPE.

### B. Substantive Compliance

Ms. S also claims that the VISD violated the substantive provisions of the IDEA by failing to place G, "to the maximum extent appropriate," in a general education environment with normally developing peers. *See* 20 U.S.C. § 1412(5)(B) (1995); 34 C.F.R. § 300.550(b) (1995). This requirement is sometimes referred to as the IDEA's strong preference for "mainstreaming" or placement in the least restrictive environment. *See Rowley*, 458 U.S. at 181 n. 4, 102 S.Ct. 3034; *id.* at 202, 102 S.Ct. 3034 ("The Act requires participating States to educate handicapped children with nonhandicapped children whenever possible."); *Poolaw v. Bishop*, 67 F.3d 830, 834 (9th Cir.1995) ("[The IDEA] requires states receiving federal assistance for the education of disabled children to establish procedures to assure that, to the maximum extent appropriate, handicapped children . . . are educated with children who are not handicapped." (internal citation and quotation marks omitted)). This alleged substantive violation is related to, albeit distinct from, the alleged procedural error in refusing to implement G's last agreed-upon IEP, which featured substantial mainstreaming.[26]

 We have developed a four-part test to determine whether a student's

25. The school district may list merely the positions, and not the names, of personnel attending. *See* Letter to Livingston, 21 Individuals with Disabilities Educ. L. Rep. 1060 (OSEP Aug. 29, 1994).

26. Because there is a "presumption" that the last agreed-upon IEP provides a FAPE, the implementation of a transfer student's last

agreed-upon IEP to the extent possible will normally satisfy the substantive component of the IDEA. *See* Letter to Campbell. However, when the last agreed-upon IEP is sufficiently flawed or out-of-date, or when the new district is not able to implement substantial portions of the last agreed-upon IEP, it will be necessary to examine independently whether the new district's proposal affords a FAPE. *Id.*

placement represents the least restrictive environment. We consider:

> (1) the academic benefits of placement in a mainstream setting, with any supplementary aides and services that might be appropriate; (2) the non-academic benefits of mainstream placement, such as language and behavior models provided by non-disabled students; (3) the negative effects the student's presence may have on the teacher and other students; and (4) the cost of educating the student in a mainstream environment.

*Clyde K.;* 35 F.3d at 1401; *see also Sacramento City Unified Sch. Dist. v. Rachel H.,* 14 F.3d 1398, 1404 (9th Cir.1994) (introducing this test in the Ninth Circuit); *B.S.,* 82 F.3d at 1500 (applying test as framed in *Rachel H.*).

 The first factor requires us to analyze the "educational benefits available to the child in a regular classroom, supplemented with appropriate aids and services, as compared to the educational benefits of a special education classroom." *Bd. of Educ. v. Holland,* 786 F.Supp. 874, 878 (E.D.Cal.1992), *aff'd sub nom., Rachel H.,* 14 F.3d at 1405. A school district is not required to attempt a placement in a regular education classroom before choosing an alternative to mainstreaming. *Poolaw,* 67 F.3d at 835. Instead, a district may, "without running afoul of the IDEA, rely upon the reports of another school district when developing its own IEP ... as long as the information relied upon is still relevant." *Id.* G's last IEP, the 1993–94 IEP from Alternative School # 1, indicated that she received a fully individualized special education academic curriculum. Evidence from G's placement at Alternative School # 1 during the 1993–94 school year also indicated that she would not perform well academically in a regular education classroom because her math and written language skills were about three years behind

comparable general education students and because she scored in the one-tenth percentile for math calculation, applied problems and broad written language. Moreover, G had been out of school for a full year before arriving in the VISD; without the opportunity to conduct an assessment, it is reasonable to assume that G would have fallen, academically, further behind her peers. Although federal courts have found that a child must be educated in a regular classroom "if the child can receive a *satisfactory* education there, even if it is not the best academic setting for the child," *Holland,* 786 F.Supp. at 879 (emphasis added), we conclude that given the available information, it was not clear that G's academic progress would have been satisfactory with temporary placement in a general education classroom. The first factor weighs in favor of special education.

The second factor looks to the non-academic benefits of mainstream placement. We conclude that G would have benefitted from the non-academic benefits of mainstream placement. A mainstream placement would give G the opportunity to form social relationships with children who are not disabled and might have helped to improve G's self-esteem. Additionally, a mainstream placement would give G the non-academic benefit of the language and behavior models provided by non-disabled students. Although G had some difficulty in earlier mainstream environments at Bagley in 1992–93, her 1993–94 placement with normally developing peers was generally successful. The second factor weighs in favor of mainstreaming.

The third factor requires us to examine the negative effects the student's presence may have on the teacher and other students. There was some evidence that G had demanded substantial attention from others in her 1992–93 placement, and that

lingering problems with personal space continued into 1993–94. More important, given the requirement that G be provided an individually appropriate educational curriculum, placing G in a general education environment would have drawn substantial time and effort from the teacher. The certified special education teacher at the VISD testified that she would have found it extremely difficult to create an individualized curriculum for G in a general education classroom, without an initial evaluation period; it is reasonable to conclude that the general education staff would have found this even more cumbersome. Although G did not have a history of behavior problems as severe as in other cases evaluating the propriety of mainstreaming, *see, e.g., Clyde K.*, 35 F.3d at 1398, we conclude that the VISD's interim placement for G was appropriate to mitigate negative effects on the teacher and other students. The third factor weighs in favor of a special education environment.

Finally, the fourth factor requires us to examine the cost of educating the student in a mainstream environment. Because the VISD concedes that it did not consider the fourth factor of cost, we conclude that cost would have not prevented placement of G in a mainstream environment.

Weighing the *Rachel H.* factors above, we conclude that, in light of the flexible and temporary nature of the plan, the VISD's interim placement was substantively proper under the IDEA, and provided for mainstreaming to the extent appropriate.

## CONCLUSION

We affirm the judgment of the district court.

**AFFIRMED.**